IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

01 MAR -6 PM 2: 10

N.U. OF DISTRICT COURT
ALABAMA

NATASHA N. DAVID,                    }
                                     }
        Plaintiff,                   }
                                     }
v.                                   }        CASE NO. CV 99-B-1062-S
                                     }
HEALTHSOUTH CORPORATION              }
and HEALTHSOUTH LAKESHORE            }
REHABILITATION HOSPITAL,             }
                                     }
        Defendants.                  }

**ENTERED**

MAR - 6 2001

**MEMORANDUM OPINION**

Currently before the court is the Motion for Summary Judgment filed by defendants

HealthSouth Corporation and HealthSouth Lakeshore Rehabilitation Hospital (collectively,

"HealthSouth" or "defendants").[1] Plaintiff Natasha N. David ("plaintiff" or "David") brings this

action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et*

*seq.*, and 42 U.S.C. § 1981. Plaintiff alleges that she was discriminated against on the basis of

her race in that she was subjected to disparate treatment,[2] a hostile work environment, and

wrongful termination. Upon consideration of the record, the submissions of the parties, the

---

[1] Although plaintiff identified both HealthSouth Corporation and HealthSouth Lakeshore
Rehabilitation Hospital in her Complaint as separate defendants, the HealthSouth Lakeshore
Rehabilitation Hospital is a corporate entity wholly owned by HealthSouth Corporation.

[2] Plaintiff also alleged a claim of discrimination based on disparate pay. (*See* Deposition
of Natasha David ("David Dep.") at 197–202, 336-38; *see also* Plaintiff's Opposition to
Defendants' Motion for Summary Judgment ("Pl.'s Br.") at 12.) However, plaintiff has since
conceded "that any claims of disparate pay are due to be dismissed." (Pl.'s Br. at 12.)



arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion is due to be granted.

## I. FACTUAL SUMMARY

HealthSouth employed plaintiff, an African American female, to work as a part-time Rehabilitation Nursing Technician ("RNT") at the Hospital in November 1995. (Corrected Affidavit of Debbie Smith ("Smith Aff.") at ¶ 2; Affidavit of Lois Boggs ("Boggs Aff."), included in DX,[3] at ¶ 2; Affidavit of C. Dan Johnson ("Johnson Aff."), included in DX, at ¶ 2.) An RNT is required to assist with patient care by feeding patients, bathing patients, taking and charting vital signs of patients, and answering patient calls. (Boggs Aff. at ¶ 3.) Plaintiff's immediate supervisors were charge nurses who were assigned to each unit of the hospital for a particular shift. (Johnson Aff. at ¶ 4.) Charge nurses were supervised by House Supervisors, who supervised all nursing personnel during a certain shift. (*Id.* at ¶ 5.) The House Supervisors who generally supervised plaintiff were Stephanie Clowers ("Clowers"), Dianne Garner ("Garner"), Anna Maltese ("Maltese"), and Lois Boggs ("Boggs"), who was also the Nurse Manager. (*Id.* at ¶ 6.) Boggs supervised Clowers, Garner, and Maltese, and served as the House Supervisor for the day shift. (*Id.* at ¶ 7.) Dan Johnson ("Johnson"), Director of Patient Care Services, supervised Boggs. (*Id.*)

Plaintiff's starting rate of pay was $6.95 per hour. (Smith Aff. at ¶ 3.) Plaintiff was not eligible for an annual raise during 1995 because she began work during the fourth quarter of the year, and defendants' policy provided that employees who begin working in the fourth quarter

---

[3] On June 2, 2000, defendants filed with the court Defendants' Motion for Summary Judgment, Evidentiary Submission and Memorandum of Law in Support Thereof, which will be referred to as "DX." Defendants have since filed other evidence into the record. When referring to this evidence, the court will not reference DX.

2

are not eligible for an annual raise that year. (Smith Aff. at ¶¶ 4-5.) On September 23, 1996, before she had completed a year's service as a part-time employee, plaintiff was asked by defendants to convert to a flexi-pool employee and she accepted. (Smith Aff. at ¶ 6; David Dep. at 185-95 and Ex. 9 attached thereto.) HealthSouth employs certain individuals as flexi-pool employees and these employees work randomly when staffing levels are not adequate. (David Dep. at 376-77; Deposition of Deborah Scruggs Smith ("Smith Dep.") at 30.) Flexi-pool employees are not eligible for annual raises. (Smith Aff. at ¶ 7; Davidson Dep. at 202-03.) Thus, plaintiff did not receive an annual raise in 1996. (Smith Aff. at ¶ 8.) Working flexi-pool was more suitable for plaintiff than working part-time because she was enrolled full-time as a college student, and had difficulty working any regular schedule. (Smith Aff. at ¶ 9; *see also* David Dep. at 174-94, 384-93 and Exs. 28, 29 attached thereto.) Plaintiff now asserts that she was pressured to become a flexi-pool employee, but admits that problems with scheduling her for part-time hours frequently arose. (David Dep. at 174-95, 384-93 and Exs. 5, 28, 29 attached thereto.) Plaintiff continued as a flexi-pool employee until HealthSouth terminated her employment in approximately late August of 1998. (Smith Aff. at ¶ 10.)

HealthSouth distributes an employee handbook to all employees, which includes a policy promoting equal employment opportunity and prohibiting discrimination and harassment in the workplace. (Smith Aff. at ¶ 11 and Ex. 1 attached thereto .) HealthSouth's policy on equal employment opportunity provides as follows:

### EQUAL EMPLOYMENT OPPORTUNITY (EEO)

It is the policy of HEALTHSOUTH and its subsidiary companies to practice its commitment to give equal employment opportunity to all qualified persons without regard to race, color, religion, sex, age, marital status, national origin, veteran status, or disability. This practice relates to all personnel matters such as compensation, benefits, training, promotions, transfers, layoffs and recalls from

3

layoff.

In the event you have an Equal Employment Opportunity (EEO) related question, problem, or complaint, first discuss it with your immediate supervisor. If you are uncomfortable discussing the matter with your supervisor, or if the situation involves your immediate supervisor, you may contact your Human Resources Director, Administrator, or the Vice President of Human Resources at the Corporate office.

(Smith Aff. at ¶ 12 and Ex. 1 at 7 attached thereto.)  Plaintiff received a copy of HealthSouth's

employee handbook and signed an acknowledgment for receipt of it.  (Smith Aff. at ¶ 13 and Ex.

2 attached thereto; David Dep. at 54-58 and Exs. 1, 3 attached thereto.)

HealthSouth had a well documented history of disciplinary problems with plaintiff.

(Smith Aff. at ¶¶ 14-16 and Ex. 3 attached thereto; David Dep. at Exs. 6, 7, 11, 12, 13, 14, 15,

16, 17, 19, 20, 26, 27.)  Several different individuals at the Hospital issued numerous write-ups

to plaintiff concerning her frequent tardiness, failing to report to work for scheduled shifts,

making excessive personal calls, taking unscheduled breaks, acting discourteously toward co-

workers, interrupting a "report" or meeting between nurses to discuss a personal matter, and

failing to record vital signs of patients.  (Smith Aff. at ¶¶ 15-16 and Ex. 3 attached thereto.)

Below is a chronological summary of the disciplinary warnings issued to plaintiff by

HealthSouth:

| | |
|---|---|
| 3-12-96 - | Verbal counseling for excessive tardiness from Clowers, House Supervisor; |
| 3-28-96 - | Verbal counseling for excessive personal calls from Rebecca Speck ("Speck"), RN, Charge Nurse; |
| 5-14-96 - | Verbal counseling for failure to report for a 3:00 to 11:00 p.m. shift from Clowers, House Supervisor; |
| 7-11-96 - | Final warning from Lois Boggs, Nurse Manager, for taking an unscheduled break: Johnson, Administrative Director, Patient Care Services, observed plaintiff eating at an |

4

|                | unscheduled break time (8:00 a.m.) and instructed Boggs to issue discipline, having previously warned plaintiff not to take unscheduled breaks; |
|----------------|------------------------------------------------------------------------------------------------------------------------------------------------|
| 9-2-96 -       | Written warning from Clowers for excessive personal calls; |
| 11-3-96 -      | Verbal counseling from Pat Bentley, RN, for discourteous behavior toward co-workers; |
| 11-29-96 -     | Verbal counseling from Maltese, House Supervisor, for inappropriate cancellation of a scheduled shift; |
| 1-15-97 -      | Notation to plaintiff's file from Clowers that while reviewing plaintiff's annual evaluation with her, plaintiff received a personal phone call, and Clowers advised plaintiff that these calls were the reason she had received low marks on her evaluation. |
| 7-09-97 -      | Verbal counseling issued by Johnson for failing to report to work on July 4, 1997, because plaintiff "forgot;" |
| 9-11-97 -      | Plaintiff placed on probation by Lois Boggs for poor attendance; |
| 10-29-97 -     | Written warning for interrupting report issued by Boggs; |
| 12-8-97 -      | Verbal counseling and written warning from Jane Stone ("Stone"), RN, Charge Nurse, for not recording vital signs; |
| 12-12-97 -     | Final warning for abuse of telephone privileges, issued by Maltese, House Supervisor; |
| 1-4-98 -       | Final warning from Garner, House Supervisor, because plaintiff failed to record vital signs. |
| 8-98 -         | Termination for falsification of time records. |

(*Id.*)

Garner, weekend House Supervisor for HealthSouth, described plaintiff as a difficult employee, because "she didn't get along with other people. She didn't get to work on time. She would schedule shifts and not show up [and] wouldn't call." (Deposition of Judy Diann Garner ("Garner Dep.") at 16-17.) Further, Garner testified that plaintiff didn't take vital signs when

5

she was supposed to. (*Id.*) Boggs, who was formerly employed as a Nurse Manager for

HealthSouth, testified that she had a chronic problem with plaintiff because plaintiff did not

report to work on time or cancel shifts, and because plaintiff failed to take patients' vital signs

altogether or at the proper time. (Deposition of Lois Boggs ("Boggs Dep.") at 6.) Speck, a

former HealthSouth charge nurse and supervisor of plaintiff, described plaintiff as aggressive

and difficult to work with. (Affidavit of Rebecca Speck ("Speck Aff."), included in DX, at ¶ 4.)

On October 28, 1997, plaintiff interrupted a meeting, known as a "report,"[4] between the

nursing staff who were coming on shift with those who were going off shift, to tell Tonya Kizer

("Kizer"), a licensed practical nurse, that she needed to call plaintiff because Kizer allegedly

owed plaintiff some money.[5] (Boggs Dep. at 34-36; Boggs Aff. at ¶¶ 4-6; David Dep. at 80-84;

*see also* Smith Aff. at Ex. 3.) Plaintiff admitted that she interrupted the report and said to Kizer,

"We need to talk," and thought that Kizer looked at her and said, "I'm busy." (David Dep. at 83.)

Plaintiff then told Kizer that she "would wait," and probably also said, "You need to call me."

(*Id.* at 83-84.) Boggs received reports that plaintiff used a threatening tone and was rude when

she interrupted the report to speak with Kizer. (Boggs Dep. at 35-36; Boggs Aff. at ¶¶ 6-8.)

---

[4] The "report" that plaintiff interrupted is a meeting that is always held when one shift is ending and another is beginning. (Boggs Dep. at 34.) The nurses on the first shift give the nurses on the oncoming shift a report on all of the patients. (*Id.*) The report is crucial to patient care and must be completed in a certain amount of time. (*Id.*)

[5] Plaintiff admitted in her deposition that she had interrupted the "report" to actually discuss with Kizer this personal dispute that was "totally unrelated to the hospital." (David Dep. at 80.) Plaintiff explained that she contended Kizer owed her money because she and Kizer had gone to an "event" or "party," and a man (whose name plaintiff could not remember), at plaintiff's request, had paid $20.00 each so she and Kizer could get into the "event." (*Id.* at 81-83.) Plaintiff contended Kizer owed her the $20.00 the man had paid for Kizer's admittance (although plaintiff had not reimbursed the man), and Kizer disagreed. (*Id.*)

Plaintiff also called Kizer at work on more than one occasion to discuss the money issue with her. (*Id.* at 83-86.) On one occasion when she called Kizer at work, another employee, Clement Ugbo ("Ugbo"), a black male, answered the telephone and told plaintiff, "she's busy and she's not coming to the phone . . . she doesn't want to talk to you." (*Id.* at 86-87.) Plaintiff told Ugbo, that Kizer owed her some money and that she wanted her money. (*Id.* at 87.)

Boggs received statements from Brenda Wilkingstad, Susan Castine, Ugbo, and Kizer, concerning plaintiff's inappropriate conduct. (Boggs Aff. ¶ 7 and Ex. A attached thereto.) Plaintiff contends that these individuals "collaborated" with Boggs to make it appear that plaintiff had acted inappropriately. (David Dep. at 287-90, 296-300.)[6]

Boggs issued a written warning to plaintiff for engaging in the conduct described above. (Boggs Dep. at 36-39; Boggs Aff. at ¶ 9.) When Boggs discussed the write-up with plaintiff, plaintiff complained that Boggs had not heard her "side of the story," that Boggs was being "discriminatory," and that this "appeared to be a prejudiced situation." (David Dep. at 89-90,

---

[6] Plaintiff alleges that Ugbo told her he was "coerced" into writing a statement. (David Dep. at 287-90, 296-300.) She later admitted that Ugbo did not use the word "coerce," but stated that Boggs told him to "just write anything." (*Id.* at 298-99.) In his statement to Boggs, Ugbo stated:

> On 10/27/97 I answered the phone . . . RNT Natasha David asked to speak with nurse Tonya, I told her she was unable to come to the phone. The phone rang again and I answered it; it was the same person asking to speak with Tonya stating she wanted to talk to her about her mother who was a patient here. I told her she was still busy and she said she would wait. I intended to put her on hold but I hung up the phone and she called right back and Brenda Wilkingstad took the phone.

(Boggs Aff. at ¶ 7 and Ex. A attached thereto.)

95-97.)[7]  Plaintiff does not allege that Kizer should have been written up.  (*Id.* at 287-88.)  Boggs allegedly also issued instructions that plaintiff and Kizer were not to be scheduled to work together on the same shift and unit.  (*Id.* at 108.)[8]  Plaintiff admitted that she is unaware of Boggs receiving reports of any other employee engaging in threatening conduct, and Boggs failing to write up such person.  (*Id.* at 295.)

    In January 1998, plaintiff allegedly engaged in a verbal altercation in front of a patient with her shift supervisor/charge nurse, Stone.  (David Dep. at 109, 113-20, 306-07; *see also* Smith Aff. at ¶ 17.)  Plaintiff was working on a shift with Stone on the Two West unit of the Hospital, when patients at the beginning and at the end of the hall began ringing for assistance almost simultaneously.  (David Dep. at 113-14.)  Plaintiff contends that she had just assisted the patient at the end of the hall, and, therefore, she went to check on the patient at the beginning of the hall.  (*Id.* at 114-15.)  While plaintiff waited on the patient, who needed assistance using the restroom, she began talking to the patient.  (*Id.* at 115.)  According to plaintiff, Stone came into the room and told plaintiff to get down to the other room.  (*Id.*)  Plaintiff told Stone she had a patient "on the bedpan."  (*Id.*)  Stone told plaintiff that she was to go to the other room immediately, and, according to plaintiff, "screamed" these instructions at plaintiff.  (*Id.*)

---

    [7]  Plaintiff's version of the facts has been accepted for purposes of this Motion, but there is a non-material disputed issue as to whether plaintiff was interviewed prior to the write-up being issued.  Boggs testified that after she received reports from nursing personnel about plaintiff's conduct, she interviewed plaintiff.  (Boggs Dep. at 35-38.)  Although plaintiff admits that she interrupted a report to discuss a personal matter with Kizer, (David Dep. at 83-89), she told Boggs that she did not say anything to Kizer.  (*See* Boggs Dep. at 36.)

    [8]  Boggs testified that there were no limits or restrictions forbidding Kizer and plaintiff from working together.  (Boggs dep. at 39.)  Further, Boggs does not recall ever telling Diane Summerford not to schedule plaintiff and Kizer together.  (*Id.*)  Even if Boggs issued such instructions, as demonstrated below, there is no evidence that such an instruction was based on race.

8

Plaintiff alleges that she again told Stone that she had a patient "on the bedpan," and she would go as soon as she finished. (*Id.*) Plaintiff then asked Stone if she could talk to Stone outside the patient's room. (*Id.* at 115-16.) Once outside the room, plaintiff told Stone, her supervisor, "I understand that there is another patient that needs some care, but next time you want to reprimand or tell me to do something, do not do it in front of another patient, but [sic] don't ever raise your voice at me. . . . That is inappropriate and you are out of control. I don't have a problem going down the hall, but I can only do one thing at a time." (*Id.* at 116.) Plaintiff further stated to Stone that after she finished taking care of the patients, she was going to go down and talk with Garner, the supervisor above Stone. (*Id.* at 117-18.)

When plaintiff went to speak with Garner, Garner had already been informed about the incident between plaintiff and Stone. (*Id.* at 118.) Plaintiff stated that she told Garner what happened, that she could not work with Stone because she felt threatened by Stone's tone, that Stone was hostile, that Stone acted inappropriately in front of a patient, and that Stone acted inappropriately toward a co-worker. (*Id.* at 118-19.) Plaintiff further stated that "[she] felt that [she] could do [her] job better on a different floor with someone that [she] could work with a little better." (*Id.*) Garner temporarily transferred plaintiff to a different unit so that plaintiff and Stone could "cool down." (Garner Dep. at 24-27.)

Plaintiff stated in her deposition that Stone created a "hostile environment," and her actions were "racially motivated." (David Dep. at 121-22.) However, plaintiff also testified that Stone's alleged "inappropriate" conduct had "little to do with racism more so than it's just not appropriate for the workplace." (David Dep. at 121-23.) Stone never used any racial slur in plaintiff's presence. (*Id.* at 122.) Plaintiff requested that Garner conduct a "conference" with Stone, Boggs, and plaintiff to discuss Stone's conduct, but she never told Garner that she

9

believed Stone created a racially hostile environment. (*Id.* at 119-21.) In her deposition,

plaintiff stated:

> The racial issue comes in – To me, in my opinion, the racial issue comes in when disparity was shown when I was told to work with her or go home. And I felt threatened by her. As opposed to when Tonya [Kizer] felt threatened by me, she was given the choice to choose whether or not I actually work with her. . . . The racial issue surrounded how the hospital actually dealt with two situations of altercations that occurred between a black employee and a white employee.

(David Dep. at 124.)[9]

Plaintiff was scheduled to work with Stone after the alleged altercation, despite Garner's

alleged instructions that plaintiff and Stone not be scheduled to work on the same shift.[10] (David

Dep. at 120-21, 133-44.) On February 21, 1998, plaintiff came to work late for a 3:00 p.m. to

11:00 p.m. shift, and discovered that Garner had shifted her from the Transitional Living Unit,

where she had been working. (David Dep. at 139-41, 143.) Plaintiff asked Garner why she had

been pulled from the Transitional Living Unit. (*Id.* at 141.) Garner explained that she had not

heard from plaintiff, and believing that plaintiff was not reporting to work, she had then

scheduled another employee to work on the Transitional Living Unit. (*Id.*) Garner then told

plaintiff she needed to go to a different unit to work. (*Id.*) Upon discovering that Kizer was

working on the unit to which plaintiff had been directed, plaintiff informed Garner that Boggs

had "instructed" that she not work on the same unit with Kizer. (*Id.* at 141-42; *see also* Garner

Dep. at 28-29.) Garner then told plaintiff she could work on a different unit, but plaintiff knew

---

[9] Plaintiff acknowledged that she does not know whether Boggs received any statements from a third party indicating that Stone had acted in an "abusive" manner, although she was aware that Boggs had received statements concerning plaintiff's threatening conduct toward Kizer. (*See* David Dep. at 288-95.)

[10] Garner testified that the separation was only for that shift and was not permanent. (Garner Dep. at 26.)

10

Stone was working on that particular unit. (David Dep. at 142; Garner Dep. at 28.) Plaintiff

explained to Garner that she did not feel comfortable working with Stone because of a past

incident with Stone, and asked Garner to allow her to swap with the employee working on the

Transitional Living Unit, who did not "particularly want to be there, and that way everybody's

happy." (David Dep. at 142-43.) Garner stated to plaintiff that she could work where she was

assigned, or she could go home. (*Id.* at 143, 146; Garner Dep. at 29-30.)

Plaintiff left the building. (David Dep. at 146.) She then returned to make a phone call,

and stated to Garner that she had better hope she had written up other employees because

plaintiff had been keeping count of the people who didn't do their work and were not written up.

(*Id.* at 146-47, 154-55.) Garner requested that Al Frazier ("Frazier"), a security guard, escort

plaintiff from the building. (*Id.* at 150-51.) Garner told plaintiff that she could not return to

work until she had spoken with Boggs or Johnson. (Garner Dep. at 30; *see also* David Dep. at

156, 158-60.) Plaintiff told Garner she was acting like a racist by instructing plaintiff to leave

the building. (David Dep. at 147-51.) Plaintiff "perceived" Garner to be racist because Garner

instructed her to leave the building, and plaintiff had to walk outside in the rain to a covered area

to wait on her brother to pick her up. (*See id.* at 151-52.) Plaintiff testified:

> My testimony is, she asked me to leave, and I didn't have a ride home, and it was
> raining outside[11] and that on the basis of just plain humanitarian basis [sic], that
> appeared racist to me, . . . Well, that particular incident is just one incident which
> kind of like — it's like I guess the straw that breaks the camel's back of many
> other incidents. I just perceived that her personality, just the way that she treated
> me in the past and the fact that no resolution had ever been met concerning the
> situation between Jane Stone and myself, that she was behaving in a
> discriminatory fashion, if not irresponsible. . . . She did not follow through to

---

[11] Plaintiff testified later in her deposition that she did not have to wait outside in the
rain, but she "probably had to walk through an amount of rain to get to a place where I was
actually sheltered." (David Dep. at 361.)

11

produce and resolve between me and a coworker, a superior, when there was an obvious problem. The problem between Jane Stone and I never was resolved, and no one felt that it was an issue, with the exception of me.

(*Id*. at 151-54.)

Plaintiff called Diana Summerford ("Summerford"), Boggs's scheduling secretary, and requested hours to work. (David Dep. at 156.) Summerford told plaintiff that she would not be scheduled until she had spoken with Boggs or Johnson. (*Id.* at 156.) After plaintiff had been off of work for a number of weeks, Debbie Smith ("Smith"), Director of Human Resources for HealthSouth Lakeshore Rehabilitation Hospital, contacted plaintiff on an unrelated matter, and plaintiff informed Smith that she was not being scheduled to work. (*Id.* at 160-63; *see also* Garner Aff. at ¶ 17; Smith Aff. at ¶ 1.) Plaintiff gave her a "synopsis" of the incident between Stone and herself. (David Dep. at 163-64.) Plaintiff testified that she told Smith:

> There was a situation, an incident with Tonya Kaiser [sic] and myself. She felt threatened and I was told that I could not work on the floor with her any longer, and I was written up for it.
>
> A similar situation occurred when a white employee and myself had an incident. And to my knowledge, that particular employee was not censured, and I asked that we be allowed to meet so that we could work out our problems, and I was denied.
>
> I was told that I had to work with her on a different occasion or to go home. I opted to go home, considering that it was a hostile and threatening situation to me.
>
> And I was told that I would be called by Lois Boggs and/or Dan Johnson, and neither of them called me. And in the interim, I'm without work and I needed some resolution on this.

(*Id*. at 167.)

Smith asked if plaintiff would like to come in and talk with her. (David Dep. at 164.)

Plaintiff suggested that Boggs come in as well and meet with Smith and her. (*Id*.) Plaintiff does

12

not remember whether she ever told Smith that she felt she was being discriminated against. (*Id.* at 165-66; 406-09.) Smith stated that she never received a complaint of racial discrimination from plaintiff. (Smith Aff. at ¶ 18.) After hearing from plaintiff in the meeting, Smith stated that no employee was to be treated preferentially at HealthSouth, that if an employee is assigned to work a floor, the employee must work that shift, and there must be no disparity shown between employees. (David Dep. at 169-70; *see also* Smith Aff. at ¶ 20.) After discussing the situation with Smith and Boggs, plaintiff was again scheduled to work. (David Dep. at 169-71; *see also* Smith Aff. at ¶ 20.) Plaintiff stated that she was pleased with Smith's resolution of the meeting. (David Dep. at 170; *see also* Smith Aff. at ¶ 21.)

Plaintiff contends that there were several instances in which she was disciplined for conduct for which other employees were not disciplined. Plaintiff was disciplined for making excessive personal phone calls. (Smith Aff. at ¶¶ 14-17 and Ex. 3 attached thereto; David Dep. at Exs. 14, 15, 26 attached thereto.) Plaintiff contends that Patti Kemper ("Kemper"), a white RNT, also talked on the telephone to her husband, but Speck, a charge nurse, failed to discipline Kemper even though Speck should have been aware of Kemper's conduct. (David Dep. at 251-53.)[12] Speck, who no longer works at HealthSouth, stated that she does not recall seeing Kemper talk on the telephone excessively and would have written Kemper up had she noticed her doing so. (Speck Aff. at ¶¶ 17-19.)

Plaintiff was written up for failing to call in and report that she was not coming or was going to be late within two hours of the beginning of a shift. (Smith Aff. at ¶¶ 14-17 and Ex. 3

---

[12] Plaintiff received three write-ups for making excessive personal calls, a verbal counseling from Speck on March 28, 1996; a written warning from Clowers on September 2, 1996; and a final warning from Maltese on December 12, 1997. (Smith Aff. at ¶¶ 14-17 and Ex. 3 attached thereto; David Dep. at Exs. 14, 15, 26, attached thereto.)

13

attached thereto; David Dep. at Ex. 17 attached thereto.)  Plaintiff contends that Kemper also

failed to call in to report she was unable to come to work or was going to be late within two

hours of the beginning of a shift. (David Dep. at 273-77.)  However, plaintiff admitted that she

does not know whether Kemper was written up for this alleged conduct.  (*Id.* at 276-77.)

Plaintiff was written up for taking an unscheduled break.[13]  (David Dep. at 226-28 and

Ex. 13 attached thereto; Smith Aff. at ¶¶ 14-17 and Ex. 3 attached thereto.)  Plaintiff contends

that Kemper also took unscheduled breaks. (David Dep. at 226-28, 230-41.)  Plaintiff admitted,

however, that she does not know whether Kemper actually took a break at 8:00 a.m., which was

a busy time, or even whether Kemper's breaks were unauthorized.  (*Id.* at 232-33.)  Plaintiff

believes that the write-up she received for taking an unscheduled break was discriminatory

because it "was [a] targeted write-up[] contributing to [an] enormous paper trail to give the

appearance of a person who is insubordinate, as opposed to someone who is being mistreated."

(*Id.* at 228.)  However, plaintiff admitted that this is merely her perception. (*See id.* at 228-30.)

Boggs testified that if any employee took unscheduled breaks, talked on the telephone

excessively, or failed to call in within two hours of the beginning of shift to report that they

would be late or absent, then they would be written up if their supervisor was aware that they

---

[13]  Johnson issued plaintiff a final warning and stated that he "observed Ms. David eating
in the conference room at 8:00 a.m. on 7-11-96.  This was not the appropriate or scheduled time
for a break."  (David Dep. at Ex. 13 attached thereto; Smith Aff. at Ex. 3 attached thereto.)  He
further stated that he "counseled Ms. David previously for the same offense [and] [i]f any further
incident of this nature occurs, [plaintiff's] employment with HealthSouth Lakeshore will be
terminated."  (*Id.*)  Boggs stated that 8:00 a.m. "is one of the most crucial times [for] feeding
patients and getting them changed into day clothes and getting them ready for therapy."  (Boggs
Dep. at 53-54.)

14

had violated these work rules. (Boggs Dep. at 52-60.)[14]

In early 1997, Emily Horton ("Horton"), a charge nurse, allegedly told plaintiff that Boggs instructed the charge nurses to write up plaintiff for "anything she [did]." (David Dep. at 11.) Horton also allegedly told plaintiff during this conversation that a black RNT, Lillie Vann ("Vann"), was watching plaintiff and taking information back to Boggs, which was how Boggs was "getting fed" everything plaintiff was doing. (*Id.* at 212-15.) Plaintiff characterized Vann as an "Uncle Tom," a "subservient black person who will sell out another black person to be in favor or to find favor with an employer who is white." (*Id.* at 214-15.) Plaintiff, however, was only aware of one incident in which Vann allegedly reported plaintiff's misconduct to Boggs. (*See id* at 215-18.) Vann reported an incident in which plaintiff gave advice to a friend on the telephone about the friend's relationship with a boyfriend. (*Id.*)

Johnson and Boggs also told plaintiff on more than one occasion that she needed to "shut up." (*See id.* at 238.) Plaintiff viewed this phrase as the "equivalent of a street word" or "profanity" because it is derogatory and condescending. (*Id.* at 238-40.) According to plaintiff, both Boggs and Johnson also told her, "You just need to shut up. That's your problem, it's your mouth." (*Id.* at 241.) Plaintiff testified that neither Boggs nor Johnson ever made any racial slurs to her. (*Id.*)

---

[14] Plaintiff also claims that white RNTs did not "complete vital signs" and were not written up, but she was written up for such conduct. (David Dep. at 218-20.) However, plaintiff could not remember any specific employee's name who actually received this preferential treatment. (*Id.*) Plaintiff claimed that she had this information in her notes at home. (*Id.* at 219-20.) Plaintiff's attorney agreed to provide these notes to defense counsel. (*Id.* at 220-22.) The notes were not provided to defense counsel, (*see* Defs.' Br. at 19 n.8), nor have the notes been submitted to the court. In fact, there is no evidence anywhere in the record supporting this allegation.

15

Johnson also told plaintiff on one occasion to take the braids out of her hair because they could swing in patients' faces. (*Id.* at 363-66.) Plaintiff viewed Johnson's instructions as racial harassment because her braids were "ethnic." (*Id.* at 365-66.) However, plaintiff never reported this complaint to anyone other than her co-workers. (*Id.* at 366-67.) Plaintiff discussed with her co-workers in employee meetings that she believed Boggs and Johnson were discriminating against her, but she never voiced these complaints to Boggs, Johnson, or any other supervisor. (*Id.* at 474-75.)

On the last evening of plaintiff's employment, in late August of 1998, plaintiff reported late for work for the 3:00 p.m. to 11:00 p.m. shift, which actually begins at 2:30 p.m.[15] (David Dep. at 72-74; Boggs Dep. at 12-13; Boggs Aff. at ¶¶ 11-12; Johnson Dep. at 14.) Plaintiff, for an unknown reason, did not have her electronically activated time card and, therefore, wrote on a "time clock addendum" that she arrived at 3:00 p.m. (David Dep. at 73-74 and Ex. 31 attached thereto; Boggs Aff. at ¶ 12 and Ex. C attached thereto; Boggs Dep. at 12; Johnson Dep. at 14.) Plaintiff contends that she did in fact report to work at 3:00 p.m. (David Dep. at 77-78.)

Garner, the House Supervisor on August 15, 1998, received a report from Gretchen Hudson ("Hudson"), a black RNT, stating that plaintiff had misrepresented the time she reported to work. (Garner Dep. at 40-41; Smith Aff. at ¶¶ 31-32; *see also* Johnson Aff. at ¶ 8.) Garner then checked Hudson's information by reviewing the time addendum sheet, which bore plaintiff's writing, indicating she had reported to work late at 3:00 p.m. (Garner Dep. at 41; David Dep. at 73-74 and Ex. 31 attached thereto.) Garner then asked the nurse at the

---

[15] Shifts begin at HealthSouth half an hour before the actual time scheduled for the shift to begin. (*See* David Dep. at 73.) Therefore, the morning shift, 7:00 a.m. to 3:00 p.m., actually begins at 6:30 a.m. and the evening shift, 3:00 p.m. to 11:00 p.m., actually begins at 2:30 p.m. (*See id.*)

16

Transitional Living Unit, Tammy Rye ("Rye"), and Frazier, a black male security guard, what time plaintiff arrived at work. (Garner Dep. at 41-42; Smith Aff. at ¶ 32; Boggs Aff. at ¶ 12 and Ex. C. attached thereto; *see also* Johnson Aff. at ¶ 8.)  Frazier indicated he had seen plaintiff attempt to park her car in a no-parking zone at 3:15 p.m., and had told her to move it, which she did.  (Boggs Dep. at 12; Boggs Aff. at ¶ 12 and Ex. C attached thereto.)  Juanita Abercrombie ("Abercrombie"), a black RNT, had to wait until 3:20 p.m. for plaintiff to report to work so that she could leave.  (Boggs Aff. at ¶ 12 and Ex. C attached thereto; *see also* Johnson Aff. at ¶ 8.)  Rye, Frazier, Jill Hembree ("Hembree"), and Abercrombie provided statements indicating that plaintiff had come in to work at approximately 3:20 p.m.  (Boggs Aff. at ¶ 12 and Ex. C attached thereto.)

Boggs investigated the situation further by discussing with witnesses when plaintiff actually arrived at work.  (Boggs Aff. at ¶ 12.)  Johnson then reviewed the evidence that plaintiff had falsified her time record, and recommended that plaintiff be terminated and that such recommendation be forwarded to Smith.  (Johnson Dep. at 17-25.)  Boggs discussed the incident with Smith, and Smith and Boggs agreed that plaintiff's employment should be terminated because plaintiff had falsified her time record.  (Boggs Dep. at 26-27, 50-51; Smith Dep. at 43, 45.)  Boggs attempted to reach plaintiff to discuss the situation with her, but was unable to do so.  (Boggs Aff. at ¶ 14; Boggs Dep. at 13-15.)  Boggs finally reached plaintiff and informed her that her employment had been terminated for falsification of time records.  (Boggs Dep. at 29-34; Boggs Aff. at ¶ 15.)  Plaintiff responded, "Oh well."  (Boggs Dep. at 33-34.)

17

HealthSouth has terminated another employee who misrepresented her time on her time records. (Smith Dep. at 48-49.)[16]  Plaintiff has failed to name any white employee who falsified a time record and was not thereafter terminated. (*See* David Dep. at 459-60.)  HealthSouth's employee handbook, of which plaintiff received a copy, provides: "Falsification or misrepresentation of time records will result in disciplinary action up to and including termination." (David Dep. at Ex. 1 at 15 and Ex. 3 attached thereto; Smith Dep. at 48.)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 10, 1998, alleging that HealthSouth discriminated against her on the basis of her race by subjecting her to harassment and to "disparate terms and conditions of employment with respect to work assignments, pay increases and being given written warnings." (David Dep. at Ex. 5 attached thereto.)  In her Charge, plaintiff also alleged that HealthSouth terminated her employment for falsifying her time record, but other white employees who committed similar offenses were not disciplined or discharged as she was. (*Id.*) Plaintiff specified in her Charge that the earliest alleged violation of Title VII occurred on March 15, 1998. (*Id.*)  Plaintiff filed a Complaint in this court on April 23, 1999, alleging race discrimination against HealthSouth Corporation and HealthSouth Lakeshore Rehabilitation Hospital under Title VII and 42 U.S.C. § 1981.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The

---

[16] No other employee has written an incorrect time on his or her time sheet addendum. (Smith Dep. at 49.)  However, one employee misrepresented her time by having another individual clock in for her. (*Id.*)  HealthSouth terminated this employee for such conduct. (*Id.*)

18

party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A.   Timeliness

#### *1.   Title VII Claim*

A plaintiff is required to file a charge of discrimination with the EEOC within 180 days of the alleged discrimination. *See* 42 U.S.C. § 2000e-5(e). If the plaintiff fails to file before this time elapses, the plaintiff's claim is untimely and, therefore, the plaintiff is procedurally barred for failure to exhaust her administrative remedies. *See Delaware State College v. Ricks,* 449 U.S. 250, 256 (1980); *Everett v. Cobb County School District,* 138 F.3d 1407, 1410 (11th Cir. 1998); *Calloway v. Partners National Health Plans,* 986 F.2d 446, 448 (11th Cir. 1993). Thus,

19

almost all of plaintiff's allegations of racially discriminatory conduct are not actionable.

Specifically, all of plaintiff's Title VII allegations regarding discriminatory write-ups, as well as

her allegation that she was demoted from part time employee status to flexi-pool employee

status, are time-barred because these incidents occurred prior to March 14, 1998 (i.e., 180 days

prior to the September 10, 1998, filing date of the charge). (*See* Smith Aff. at ¶¶ 14-16 and Ex. 3

attached thereto; David Dep. at Exs. 6-7, 11-17, 19-20, 26-27.) The last disciplinary write-up

plaintiff received occurred on January 4, 1998, because of plaintiff's failure to record vital signs.

(Smith Aff. at ¶ 16 and Ex. 3 attached thereto.) This event is well outside the 180 day window.

Thus, only plaintiff's discriminatory discharge claim is timely under Title VII.

Facing the reality that her Title VII claims before March 4, 1998, are time barred,

plaintiff attempts to utilize the continuing violation doctrine to resurrect her expired claims.

(Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Br.") at 2-3.) The

continuing violation exception allows for an extension of the limitations period based on a claim

of acts committed under an ongoing policy of discrimination. *See, e.g., Beavers v. American*

*Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir. 1992); *Selan v. Kiley,* 969 F.2d 560, 564-65

(7th Cir. 1992). To invoke the exception, the otherwise time-barred claim must be part of a

pattern or continuing practice out of which the timely-filed incident arose. *Roberts v. Gadsden*

*Memorial Hospital,* 835 F.2d 793, 800 (11th Cir. 1988) (citing *United Air Lines v. Evans,* 431

U.S. 553 (1977)). The Eleventh Circuit has stated:

> The continuing violation doctrine does not exist to give a second chance to an
> employee who allowed a legitimate Title VII claim to lapse. It is only when a
> substantial nexus exists between a timely filed claim and an otherwise time-
> barred claim that they may be viewed as constituting a single violation, part of
> which falls within the limitations period. Moreover, the existence of such a nexus
> serves to alleviate the employer's burden in defending a remote managerial
> decision. In principle, much of the evidence that the employer would need to

20

> proffer in defending against the timely-filed claim should be relevant to his
> defense against the time-barred claim as well.

*Roberts,* 835 F.2d at 800.  The Eleventh Circuit has further stated:

> It is simply insufficient for [the employee] to allege that his termination gives
> present effect to the past illegal act and therefore perpetuates the consequences of
> forbidden discrimination.  The emphasis is not upon the effects of earlier
> employment decisions; rather, it is upon whether any present violation exists.

*Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1435 (11th Cir. 1998) (citing *Ricks,* 449

U.S. at 258).  Thus, the court must determine whether defendants' acts were related closely

enough to constitute a continuing violation or were merely discrete, isolated, and completed acts

to be regarded as individual violations.  *Selan,* 969 F.2d at 565.

In determining whether the doctrine is applicable, the court must analyze three factors --

whether the allegations are related in: (1) subject matter; (2) frequency; and (3) permanence.

*See, e.g., Roberts,* 835 F.2d at 800-01.  In the present case, the first factor, the subject matter of

the alleged discrimination, was different in each event of which plaintiff complains.  The only

common thread between the incidents was that they had the same result: plaintiff was

disciplined.  Various HealthSouth employees disciplined plaintiff for different violations of

HealthSouth policy.[17]  Thus, the first factor weighs against applying the continuing violation

doctrine.

The second factor, frequency, also suggests that the incidents were not sufficiently

related to invoke the doctrine.  Where "incongruent discriminatory events are separated by a

substantial time hiatus, the hiatus further supports the conclusion that the two incidents were

discrete and unrelated."  *Roberts,* 835 F.2d at 801.  Over a two-and-a-half year period prior to

---

[17]  Plaintiff has never alleged that she did not commit these violations.

21

her termination, plaintiff received thirteen disciplinary actions. (Smith Aff. at ¶¶ 14-16 and Ex. 3 attached thereto.) Such disciplinary actions were given by different HealthSouth supervisors, and, for the most part, occurred about once every two months. (*Id.*) These write-ups are more in the nature of isolated work incidents rather than recurring and related acts.

The third factor, the degree of permanence triggering plaintiff's awareness that her rights were violated, also militates against finding a continuing violation. Each act culminated in a disciplinary action against plaintiff. Further, plaintiff was aware of her rights,[18] and she consistently stated that she felt her rights were being violated each time she was disciplined. This supports the conclusion that these incidents occurred with such permanence that plaintiff should have been prompted to assert her rights, and, therefore, plaintiff has failed to meet the third factor of the continuing violation doctrine.

For the reasons stated above, the continuing violation doctrine cannot be used to save plaintiff's untimely claims. *See Goldman v. Sears, Roebuck & Co.,* 607 F.2d 1014, 1018-19 (1st Cir. 1979) (employee could not use doctrine to challenge otherwise time-barred transfer claim

_____

[18] As noted above, plaintiff received a copy of HealthSouth's employee handbook and signed an acknowledgment indicating her receipt of the handbook. (Smith Aff. at ¶ 13 and Ex. 2 attached thereto; David Dep. at 54-58 and Exs. 1, 3 attached thereto.) The handbook states:

> In the event you have an Equal Employment Opportunity (EEO) related question, problem, or complaint, first discuss it with your immediate supervisor. If you are uncomfortable discussing the matter with your supervisor, or if the situation involves your immediate supervisor, you may contact your Human Resources Director, Administrator, or the Vice President of Human Resources at the Corporate office.

(Smith Aff. at ¶ 12 and Ex. 1 at 7 attached thereto.)

22

even when he requested transfer back),[19] *cert. denied,* 445 U.S. 929 (1980). Each write-up plaintiff received, as well as her conversion to flexi-pool status, constituted a discrete employer action and each had a degree of permanence, thereby triggering plaintiff's duty to assert her rights. Thus, plaintiff has not alleged facts sufficient to establish a continuing violation, and those events that occurred prior to March 14, 1998, are time-barred under Title VII.

### 2.   § 1981 Claim

Alabama's two-year statute of limitations for personal injury actions applies to plaintiff's claims under 42 U.S.C. § 1981. *Hill v. Transit Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1545-46 (11th Cir. 1988), *modified by* 848 F.2d 1522 (11th Cir. 1988); *Wright v. Circuit City Stores, Inc.*, 82 F. Supp. 2d 1279, 1288 n.5 (N.D. Ala. 2000); Ala. Code (1975) § 6-2-38. Courts in the Eleventh Circuit have applied the continuing violation doctrine to § 1981 claims. *See, e.g., Malone v. K-Mart Corp.,* 51 F.Supp.2d 1287, 1304-06 (M.D. Ala. 1999); *Lane v. Ogden Entertainment Inc.,* 13 F. Supp. 2d 1261, 1270 (M.D. Ala. 1998). For the same reasons noted in Section III (A)(1) above, plaintiff's argument that the continuing violation doctrine applies to resurrect her expired claims is without merit. Therefore, all incidents occurring prior to April 23, 1997, (i.e., two years prior to the date plaintiff filed her complaint) are time-barred under the statute of limitations applicable to Section 1981 actions. Thus, plaintiff's only timely claims under Section 1981 are her termination claim and any claims based on write-ups given to her on or after April 23, 1997.

_____

[19] Plaintiff does not assert that she ever requested a transfer from flexi-pool status back to part time and her initial transfer to flexi-pool status occurred on September 23, 1996, more than 180 days before she filed a charge of discrimination with the EEOC. Further, she has repeatedly asserted that she viewed the write-ups as obvious discrimination. (*See, e.g.,* David Dep. at 229 -30.) Thus, there can be no question that plaintiff knowingly failed to timely exercise her rights.

**B.    Hostile Environment Claim**

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1).  The Supreme Court set forth the analytical framework to be followed in cases involving discrimination based on harassment by a supervisor in the cases of *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Industries v. Ellerth,* 524 U.S. 742 (1998).  However, the threshold question is whether discrimination has, indeed, occurred.  *See Burlington Industries,* 524 U.S. at 754.  Plaintiff alleges that "she was repeatedly harassed throughout her employment up to the time her employment was terminated."  (Pl.'s Br. at 2.)  Specifically, "Plaintiff testified that she was continually harassed by her supervisor, Lois Boggs, and by other supervisors at the direction of Ms. Boggs, throughout her employment."  (*Id.* at 3.)

> *1.    Prima Facie Case*

An employer may be liable for subjecting an employee to a hostile work environment if the employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986) (citation omitted); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989).  Hostile work environment harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted); *see also Cross v. Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995).  In order to succeed on her hostile environment claim, plaintiff must

24

demonstrate: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome racial harassment; (3) that the harassment was based on her race; and (4) that the harassment affected a term, condition, or privilege of employment. *Watkins v. Bowden,* 105 F.3d 1344, 1355 (11th Cir. 1997); *see also Cross v. Alabama,* 49 F.3d 1490, 1504 (11th Cir. 1995).

The conduct at issue must be severe or pervasive enough to create an "objectively hostile or abusive work environment" to be actionable under Title VII. *Harris*, 510 U.S. at 21; *see also Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995). Thus, the "mere utterance" of a remark that engenders offense does not affect the terms, conditions, or privileges of employment to a sufficient degree to violate Title VII. *Henson*, 682 F.2d at 904; *see also Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 (5th Cir. 1999) ("Incidental, occasional or merely playful . . . utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment.") (citations and internal quotations omitted).

In addition, whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *Edwards*, 49 F.3d at 1521-22; *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (4th Cir. 1997) (whether racial slurs constitute a hostile work environment typically depends upon "the quantity, frequency, and severity" of those slurs, considered "cumulatively in order to obtain a realistic view of the work environment") (citations omitted). The standard is "demanding," and

25

the conduct alleged must be "extreme." *Faragher*, 524 U.S. at 788.

Plaintiff has not established a prima facie case because the conduct at issue does not rise to the level of severity or pervasiveness required by law. The incidents of which plaintiff complains are: (1) Johnson and Boggs telling her to shut her mouth; (2) Boggs instructing other supervisors to write plaintiff up for anything she did; (3) Stone, plaintiff's supervisor, yelling at her regarding an issue of patient care; and (4) Johnson telling plaintiff not to wear braids in her hair.

Plaintiff testified both Boggs and Johnson told her, "You just need to shut up. That's your problem, it's your mouth." (David Dep. at 241.) Assuming these statements were made, as the court must in deciding defendants' Motion for Summary Judgment, there is no evidence before the court that these statements were motivated by race. (*See id.* at 237-43.) While such statements are offensive and rude, Title VII is not a "general civility code. As noted by the Supreme Court:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes and occasional teasing. We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.

*Faragher,* 524 U.S. 775, 788 (1998) (citations and quotations omitted).

Likewise, there is no evidence indicating that Bogg's alleged instruction to the charge nurses was based on race and, more importantly, no evidence that plaintiff's disciplinary write-ups were a result of this alleged instruction.[20]  Plaintiff has offered no evidence indicating that

---

[20] It bears noting that plaintiff's evidence regarding Boggs's instruction to the charge nurses "to write [plaintiff] up for every little thing" is hearsay, and, as discussed later in this

she did not commit the violations for which she was disciplined. Moreover, HealthSouth policy specifically provides for disciplinary measures when employees engage in the conduct for which plaintiff was written up. (*See* David Dep. at Ex. 1 at 19.)

Plaintiff testified that Stone inappropriately yelled at her in front of a patient. (*See* David Dep. at 109, 113-20.) Stone was plaintiff's supervisor, and the incident involved a matter of patient care. Plaintiff testified that Stone's conduct toward her created a "hostile environment" and Stone's actions were racially motivated. (*Id*. at 121-22.) Plaintiff later admitted, however, that Stone's conduct had "little to do with racism more so than it's just not appropriate for the workplace." (*Id.* at 121-23.) There is no evidence before the court indicating that Stone's conduct was racially motivated. Moreover, being yelled at for poor job performance, whether warranted or not, does not rise to the level of severity required to establish a racially hostile work environment under Title VII. As noted above, "discourtesy or rudeness, offhand comments and isolated incidents (unless extremely serious)" are not actionable. *Indest,* 164 F.3d at 264.

Plaintiff also testified that Johnson told her to take the braids out of her hair because they could swing in patients' faces. (David Dep. at 363-66.) Plaintiff stated that this was racial harassment because her braids were "ethnic." (*Id.* at 365-66.) This conduct, even if motivated by race, does not rise to the level of severity required to create a hostile working environment.

It is axiomatic that racial harassment must be based on race. The incidents of alleged racial harassment, considered cumulatively, fail to meet the requisite degree of severity or pervasiveness to establish a hostile environment based on race. There is no evidence that any racially motivated conduct affected a term, condition, or privilege of plaintiff's employment.

---

Memorandum Opinion, subject to various interpretations. (*See* David Dep. at 211-13, 247, 268-70, 320-25; *see also* Pl.'s Br. at 3-4.)

27

"Not everything that makes an employee unhappy is an actionable adverse action, otherwise every trivial personnel action that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Greene v. Loewenstein, Inc.,* 99 F.Supp.2d 1373, 1382 (S.D. Fla. 2000) (quoting *Doe v. DeKalb County Sch. Dist.,* 145 F.3d 1441, 1449 (11th Cir. 1998) and discussing the Eleventh Circuit's test for determining whether an employment action is adverse) (internal quotations omitted)). Because the conduct upon which plaintiff bases her claim was not severe and pervasive, defendants are entitled to judgment as a matter of law on plaintiff's claim that she was subjected to a racially hostile environment.

## C.   Disparate Treatment[21]

In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

### *1.   Direct Evidence*

There is no direct evidence to support plaintiff's claim of disparate treatment race discrimination. Thus, plaintiff must rely on circumstantial evidence to support her claims.

---

[21] Plaintiff's discrimination claims under Title VII and under § 1981 are analyzed under the same legal standard. *See generally Lincoln v. Board of Regents,* 697 F.2d 928, 935 n. 6 (11th Cir. 1983) (holding that the elements of a discrimination claim under § 1981 and Title VII are identical).

28

## 2.    *Circumstantial Evidence*

Because plaintiff is relying on circumstantial evidence to support her claims, the

court is governed by the familiar, tripartite framework established by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of*

*Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d

1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit

jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a

prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53.  "The facts necessarily will

vary in Title VII cases, and the specification [] of the prima facie proof required from [plaintiff]

is not necessarily applicable in every respect to differing factual situations." *McDonnell*

*Douglas,* 411 U.S. at 802 n. 13.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts

to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment

action. *McDonnell Douglas*, 411 U.S. at 802.  Defendant's burden to rebut the presumption

created in such a situation is one of production rather than proof, requiring defendant to

articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 257-58.  In

satisfying this burden:

> [t]he employer's burden of rebuttal is "exceedingly light."  Since
> the rebuttal burden is one of production only, the employer "need
> not persuade the court that it was actually motivated by the
> proffered reasons . . . .  It is sufficient if the [employer's] evidence
> raises a genuine issue of fact as to whether it discriminated against
> the [employee]."

*Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989) (quoting

*Burdine,* 450 U.S. at 254-55) (alterations in original).

If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnell Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Id.* A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs,* 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, plaintiff must submit sufficient nonconclusory evidence that defendant's articulated legitimate reasons were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts sufficient doubt on defendant's proffered reasons such that a reasonable fact finder would conclude that those reasons did not actually motivate the employment decisions. *See Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2108-09 (2000); *Combs*, 106 F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

### 3. Discipline

Plaintiff claims that she was subjected to discriminatory discipline when: (1) she was not allowed to work with Kizer after their altercation, but the Hospital did not prohibit Stone from working with plaintiff; (2) Kemper was allegedly not disciplined for excessive personal calls, but

30

plaintiff was disciplined for such conduct; (3) Kemper was not disciplined for taking

unscheduled breaks, but plaintiff was disciplined for such conduct; and (4) Kemper was not

disciplined for failing to call in within the proper time if she was going to be late or absent, but

plaintiff was disciplined for such conduct. Only plaintiff's claims concerning (1) HealthSouth's

failure to discipline Stone for allegedly being rude to plaintiff, but disciplining plaintiff for

interrupting the report to discuss a personal matter with Kizer, and (2) HealthSouth's failure to

discipline Kemper for allegedly making excessive personal calls, but disciplining plaintiff for

abuse of telephone privileges, are not time-barred.[22] All other disparate discipline claims,

whether plaintiff proceeds under Title VII or § 1981, are time-barred.

   To establish a prima facie case of disparate discipline, plaintiff must demonstrate:

(1) that she is a member of a protected class; (2) that she engaged in misconduct similar to that

of a non-protected person; and (3) that similarly situated employees outside the protected class

received more favorable treatment. *See Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.

1999); *Nowlin v. Jones Intercable, Inc.,* 102 F. Supp. 2d 1364, 1369 (S.D. Ga.. 2000).

                    a.    Failure to Discipline Stone/ Written Warning to Plaintiff
                          for Interrupting the Report

   As noted above, to establish a prima facie case of disparate disciplinary treatment,

plaintiff must show that she and similarly situated white employees were disciplined differently

_____

   [22] As noted above, the date on which the statute of limitations began to run under 42
U.S.C. § 1981 was April 23, 1997. Title VII's 180 day limitation is even shorter. The only
allegedly discriminatory disciplinary write-ups which plaintiff received after April 23, 1997 are
the October 29, 1997, written warning for interrupting the report, issued by Boggs, and the
December 12, 1997, final warning for abuse of telephone privileges, issued by Maltese. (*See*
Smith Aff. at ¶¶ 14-16 and Ex. 3 attached thereto.) Plaintiff's claims regarding disparate
discipline for taking unscheduled breaks and for failing to call in within the proper time occurred
more than two years prior to the filing of the Complaint and are therefore outside the applicable
statute of limitations.

31

for the same or substantially similar misconduct. *Maniccia*, 171 F.3d at 1368. Plaintiff cannot establish a prima facie case because she has not identified a similarly situated white comparator who was treated more favorably with respect to discipline. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (quotations and citations omitted). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998), *modified in part on non-relevant grounds* 151 F.3d 1321 (1998). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia*, 171 F.3d at 1368 (quoting *Jones*, 137 F.3d at 1311). As the Eleventh Circuit has held, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Id.* at 1368.

Plaintiff's assertion that HealthSouth did not discipline Stone for engaging in conduct similar to that for which HealthSouth disciplined plaintiff fails because plaintiff and Stone were not similarly situated employees. Stone did not engage in misconduct which was similar to plaintiff's. Stone was plaintiff's supervisor, who allegedly harshly admonished plaintiff for failing to do her assignments and tend to patients. (David Dep. at 109, 113-19; Garner Dep. at 24-27.) In comparison, plaintiff interrupted a "report," an important meeting between her

32

supervisors, to discuss a personal matter[23] with Kizer. (Bogg Dep. at 34-36; Boggs Aff. at ¶¶ 4-6; David Dep. at 80-84; *see also* Smith Aff. at Ex. 3.) Further, several witnesses provided statements to Boggs that plaintiff acted in an unprofessional manner toward Kizer and had engaged in a pattern of unprofessional behavior. (Boggs Dep. at 35-36; Boggs Aff. at ¶¶ 6-8 and Ex. A attached thereto.) Boggs disciplined plaintiff because of her conduct toward Kizer. (Boggs Dep. at 36-39; Boggs Aff. at ¶ 9.) In comparison, no one provided any such statement to Boggs concerning Stone's alleged conduct toward plaintiff. Plaintiff admitted that she was unaware of whether Boggs ever received third-party reports of Stone's conduct toward her. (David Dep. at 295.)

In addition, different supervisors were involved in each incident.[24] Boggs testified that she had no knowledge of the Stone situation. (Boggs Dep. at 51-52.) Although Garner had knowledge of the Stone incident, she was not involved in any write-up given to plaintiff regarding the incident with Kizer. (Garner Dep. at 24-27; Boggs Aff. at ¶¶ 4-9.) The fact that different supervisors were involved in these decisions adds weight to defendants' argument that plaintiff and Stone were not similarly situated. "'Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.'" *Jones*, 151 F. 3d at 1312 n.7 (quoting *Cooper v. City of North Olmstead*, 795 F. 2d 1265, 1271 (6th Cir. 1986), which held that the fact that comparators' violations were committed when they were under supervisors different from the plaintiff's supervisor can suggest a basis other than

---

[23] As noted above, the personal matter involved a disputed personal debt.

[24] As noted above, Boggs issued the write-up to plaintiff regarding the incident with Kizer, whereas Garner was the supervisor involved in the incident with Stone. (*See* Boggs Dep. at 36-39; Boggs Aff. at ¶ 9; Garner Dep. at 24-27.)

race for the difference in treatment received by two employees). "Different supervisors may have different management styles that -- while not determinative -- could account for the disparate disciplinary treatment that employees experience." *Jones*, 151 F.3d 1312 n.7. The court "cannot sit as a super-personnel agency and judge the merits of a particular [disciplinary action]; the inquiry is limited to determining whether Plaintiff's evaluations [and write-ups] were improperly based on racial animus." *Simmons v. Neumann*, 1999 WL 1893667, at * 14 (S.D. Fla. November 5, 1999). There is no evidence before the court on which a reasonable juror could find that Stone and plaintiff are similarly situated employees.

Assuming that plaintiff established a prima facie case, defendants have met their burden of articulating a legitimate, nondiscriminatory reason for their actions. As defendants noted, plaintiff "received no less than 13 disciplinary actions . . . [which] were initiated by approximately 8 different supervisors and were the result of a number of different policy violations." (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Br.") at 1-2.) Further, defendants assert that Stone was not disciplined because she was plaintiff's supervisor, and she was admonishing plaintiff for failing to do her assignments and tend to patients. (*See* Defs' Br. at 35-36; *see also* David Dep. at 109, 113-16.) Plaintiff, on the other hand, was disciplined because she "rudely interrupted a 'report,' a very important meeting between her supervisors, to discuss a trivial personal matter . . . with Kizer and there was a pattern of similar misconduct." (Defs.' Br. at 35.) Thus, defendants have satisfied their burden of coming forward with a legitimate nondiscriminatory reason for their actions. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (concluding that poor performance and insubordination constitute legitimate nondiscriminatory reasons for employer's action); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (holding that an

34

employer's good faith belief that an employee's performance is unsatisfactory constitutes a

legitimate, nondiscriminatory reason for an adverse employment action).

Plaintiff has failed to produce any evidence raising a genuine issue of fact as to pretext.

In fact, the evidence offered by plaintiff demonstrates a lack of discriminatory animus. As

evidence of pretext, plaintiff asserts that black employees were consistently treated differently

than white employees. However, as plaintiff points out in her brief, defendants disciplined white

employees as well as plaintiff. According to plaintiff:

> Margaret "Peggy" Dick, a white HealthSouth employee, has been reprimanded
> for many of the same things plaintiff allegedly did which resulted in [plaintiff's]
> termination, such as timely attendance, failure to document a patient's skin
> problems; failure to clock in or out on four different occasions within a month's
> time period; complaints from patients about her rudeness and authoritative
> manner; multiple errors on the narcotic sheet and the narcotic count; tardiness;
> being rude and unprofessional to her supervisor; and making a medical diagnosis
> in violation of the Nurse Practice Act. . . . It has also been noted on her
> performance evaluations that she has problems communicating with others; that
> she has frequently been tardy; that she is overly aggressive; that she needs to
> soften her tones; and that she is defensive when directions or questions are
> directed to her regarding her assigned patients. These reprimands and
> performance appraisals were given by Lois Boggs. . . . Tanya [sic] Kiser, a white
> employee, has been reprimanded for tardiness; her behavior towards patients . . . ;
> leaving a patient unattended in the bathroom which resulted in the patient falling;
> failing to place a patient on fall protocol after requested by the family; failure to
> document vital signs; being absent from a scheduled shift; and failure to provide
> safety for a patient. It has also been noted on Kiser's performance appraisals that
> she needs to be more receptive to feedback from the charge nurse. . . . These
> reprimands and performance appraisals were also given by Lois Boggs. . . .
> Rebecca Speck, a white employee, has been reprimanded for leaving a patient
> "uncapped" for eleven hours and for tardiness. . . . These reprimands and
> performance appraisals were also given by Lois Boggs.

(Pl.'s Br. at 6-7 (citing Dick Personnel File; Kiser Personnel File; Speck Personnel File).) Such

evidence of equal treatment is strong proof that plaintiff was not singled out by defendant, and

specifically, by Boggs. *See, e.g., Pollard v. Red Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.

1987) (no pretext where evidence demonstrated that all employees who violated the work rule in

question were disciplined).

Further, plaintiff alleges that she was told by three individuals at HealthSouth (Emily Stewart, Sue Alford, and Karen Smith) that Boggs "was looking for reasons to reprimand Plaintiff and instructed the charge nurses 'to write her up for every little thing.'" (Pls' Br. at 3-4 (citing David Dep. at 211-13, 247, 268-70, 320-25).) Plaintiff's testimony as to this allegation is hearsay. Plaintiff has failed to provide admissible evidence regarding Boggs' statements. Additionally, these statements are subject to various interpretations. Plaintiff has failed to raise any issue of fact regarding the validity of the write ups she received, and the evidence demonstrates that white employees received write-ups for much of the same conduct. These facts suggest that the alleged instructions were not based on plaintiff's race. Furthermore, even if the court considered the alleged statements as evidence of pretext, this is insufficient evidence on which a reasonable jury could find that the reasons articulated by Boggs for disciplining plaintiff were pretext for illegal discrimination.

Plaintiff's assertion that she was "also told by her co-employees that she was being targeted because of her race" (*see* Pl.'s Br. at 4 (citing David Dep. at 229)), is simply incorrect. Plaintiff's citation to the record (i.e., page 229 of her deposition) does not include the entire portion of plaintiff's testimony regarding this matter. Plaintiff stated:

> A.   Well, it was obvious that I was always being picked on for things that were, you know, generally given kind of a blink of the eye when other people did them.
>
> Q.   So no one had told her you were being picked on because of your race or being targeted because of your race, she just said that because it was obvious, is that what you're telling me?
>
> A.   Yes.

36

> Q.    Anybody else who said to you: You're being targeted
>       because of your race?
>
> A.    No, I assumed that myself.

(David Dep. at 229-30.) Plaintiff's testimony therefore shows that this co-employee had no

independent evidence or personal knowledge of the matter but rather only relayed to plaintiff her

personal opinion, and plaintiff "assumed" on her own that she was being targeted because of her

race. This evidence is insufficient to establish pretext.

Plaintiff also offers the testimony of Lois Franklin ("Franklin") that "she has seen white

employees do things and get away with it, while black employees are reprimanded, giving as an

example employees acting out inappropriately with patients," (Pl.'s Br. at 5 (citing Deposition of

Lois Franklin ("Franklin Dep.") at 31-36)), that "she herself has been a victim of race

discrimination while . . . employed by defendants," (*id.* at 8 (citing Franklin Dep. at 7, 10-12, 17-

20, 28, 40)), and that "at least three other black employees have complained to [her] that they

have been given harder work and less desirable assignments," (*id.* at 8 (citing Franklin Dep. at

23-28)). However, such vague assertions regarding generalized differences in treatment are

insufficient to establish pretext.

Plaintiff offers nothing more than speculation that defendants' actions were racially

discriminatory. Accordingly, her claims fail. *See Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d

1023, 1026 (11th Cir. 1994) (An "employee's mere suspicion of [race] discrimination,

unsupported by personal knowledge of discrimination will not constitute pretext."); *Elrod v.

Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991) ("Conclusory allegations of

discrimination, without more, are not sufficient to raise an inference of pretext or intentional

discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-

discriminatory reasons for its action.") (citations and quotations omitted); *Simmons,* 1999 WL

1893667, at * 11 ("Plaintiff's mere belief, speculation, or conclusion that he was subject to

discrimination does not create an inference of discrimination or satisfy his burden.") (citing

*Coutu v. Martin County Bd. of County Comm'rs.,* 47 F.3d 1068, 1074 (11th Cir. 1995)); *Lewis-*

*Webb v. Qualico Steel Co.*, 929 F. Supp. 385, 392 (M.D. Ala. 1996) ("Inferences and opinions

must be grounded on more than flights of fancy, speculations, hunches, intuitions or rumors;

discrimination law would be unmanageable if disgruntled employees could defeat summary

judgment by speculating about the defendant's motives.") (quoting *Rand v. CF Indus., Inc.*, 42

F.3d 1139, 1146 (7th Cir. 1994)).

> Further, as noted by the Eleventh Circuit:

> [W]here the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence.

*Holifield*, 115 F.3d at 1565. Plaintiff offers no evidence to rebut defendants' assertion that

plaintiff was disciplined for anything other than legitimate performance problems. Even

assuming defendants erroneously disciplined plaintiff, such an error in judgment, without more,

is insufficient as a matter of law to establish pretext. *See Elrod*, 939 F.2d at 1470 (employer who

disciplined employee for violation of sexual harassment policy entitled to summary judgment

where employee produced no evidence discrediting the employer's actions or otherwise calling

into question the legitimacy of the employer's belief that the employee was guilty of sexual

harassment); *Hawkins v. Ceco Corp.,* 883 F.2d 977, 980 n.2 (11th Cir. 1989) (That the employee

did not in fact engage in misconduct reported to the employer is irrelevant to the question of

whether the employer believed the employee had done wrong.); *Nix*, 738 F.2d at 1187 ("While

an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.").

Here, there is no evidence that the employment decision of which plaintiff complains was based on plaintiff's race in violation of § 1981 and Title VII. Plaintiff has not presented significantly probative evidence to meet her burden of establishing pretext, and she has not produced sufficient evidence upon which a reasonable juror could infer that she was subjected to disparate disciplinary treatment. Therefore, defendants are entitled to judgment as a matter of law as to this claim.

          b.      Failure to discipline Kemper/ Final Warning to Plaintiff for Abuse of Telephone Privileges

Likewise, plaintiff's complaint that she was subjected to discipline for making excessive personal calls when Kemper was not so disciplined fails. Speck, who plaintiff believes should have been aware of Kemper's alleged infractions, stated that she does not remember Kemper talking on the phone excessively. (Speck Aff. at ¶ 17.) Moreover, plaintiff received a final warning, after at least two previous warnings, for the same conduct. (*See* Smith Aff. at ¶¶ 14-16 and Ex. 3.) There is no evidence that Kemper had already been warned on at least two occasions for excessive use of the phone. Thus, Kemper is not similarly situated to plaintiff. Finally, the decision makers are again different, and this fact alone may be enough to render plaintiff and Kemper not similarly situated. *See Jones*, 151 F. 3d at 1312 n. 7. Plaintiff has failed to submit any evidence that Kemper was similarly situated to her. Plaintiff cannot establish a prima facie case because plaintiff has failed to establish any employee similarly situated to her who was treated differently. Thus, her claim for disparate discipline necessarily fails.

Assuming that plaintiff established a prima facie case, defendants have met their burden of articulating a legitimate, nondiscriminatory reason for their actions. Defendants contend that plaintiff was written up for making excessive phone calls because she had previously received two warnings for such conduct, and such punishment is consistent with defendants' disciplinary policy. (*See* Defs.' Br. at 36; *see also* Smith Aff. at ¶¶ 14-16 and Ex. 3.) Further, defendants assert that "[o]utside of Lois Franklin, who apparently never wrote Plaintiff or Kemper up, there is no evidence that any other supervisor at HealthSouth was aware of Kemper's personal use of the telephone." (Reply Brief in Support of Defendants' Motion for Summary Judgment ("Reply Br.") at 8.) Thus, defendants have satisfied their burden of coming forward with a legitimate nondiscriminatory reason for their actions. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (concluding that poor performance and insubordination were legitimate nondiscriminatory reasons for employer's action); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (holding that an employer's good faith belief that an employee's performance is unsatisfactory is a legitimate, nondiscriminatory reason for an adverse employment action).

Plaintiff has failed to produce any evidence raising a genuine issue of fact as to pretext. As noted above, plaintiff only offers conclusory allegations as evidence of pretext. The employee handbook provides: "Personal use of Company telephones must be strictly limited. Public telephones are available for employee use on breaks and at meal times." (Smith Aff. at Ex. 1 at 18 attached thereto.) Plaintiff has failed to raise any issue of fact regarding the validity of the write-ups she received. As noted by the Eleventh Circuit:

> [W]here the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat

summary judgment, in the absence of other evidence.

*Holifield*, 115 F.3d at 1565. Moreover, the evidence shows that white employees were disciplined and reprimanded for much of the same conduct as plaintiff.

Here, there is no evidence that the employment decision of which plaintiff complains was based on plaintiff's race in violation of § 1981 and Title VII. Plaintiff has not presented significantly probative evidence to meet her burden of establishing pretext, and she has not produced sufficient evidence upon which a reasonable juror could infer that she was subjected to disparate disciplinary treatment. Therefore, defendants are entitled to judgment as a matter of law as to this disparate treatment claim.

### 4. *Discharge*

In order to establish a prima facie case of discriminatory discharge, plaintiff must demonstrate: (1) that she belongs to a racial minority; (2) that she was subjected to adverse employment action (i.e., termination); (3) that her employer treated similarly situated employees of other races more favorably; and (4) that she was qualified to do the job. *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d at 1310, *modified in part on non-relevant grounds*, 151 F.3d 1321 (1998) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

In *Jones*, the Eleventh Circuit emphasized the necessity of showing that similarly situated non-minority employees were treated more favorably. *See Jones*, 1337 F.3d at 1313. The court stated, "[i]t is this showing — and not the demonstration of racial animus alone — that addresses the fundamental issue in a Title VII disparate treatment case: whether the defendant intentionally discriminated against the plaintiff." *Id.* (citations and quotations omitted). Plaintiff cannot make this critical and fundamental showing. Plaintiff admitted in her deposition that she knew of no other white employee who HealthSouth believed to have falsified his or her time

41

records and yet was allowed to continue working. (David Dep. at 459-60.) Smith testified that all other employees who had falsified their time records had also been terminated. (Smith, 48:20-49:21.) Because there is no similarly situated employee, plaintiff cannot establish a prima facie case.

Even assuming that plaintiff established a prima facie case, HealthSouth has clearly established a legitimate, non-discriminatory reason for plaintiff's termination in that it believed plaintiff had falsified her time record, and under defendants' discipline policy, such conduct warranted disciplinary action, up to and including termination. (Smith Aff. at ¶¶ 31-32; Boggs Aff. at ¶¶ 11-15; Johnson Dep. at 14-25; Smith Dep. at 48.)

Further, plaintiff has failed to offer any evidence on which a reasonable jury could find defendants' articulated reason for plaintiff's termination to be pretext for illegal race discrimination. Plaintiff's mere belief, speculation, or conclusory accusation that she was subject to discrimination will not create an inference of discrimination or satisfy her burden of establishing pretext. *See Coutu*, 47 F.3d at 1073-74. Plaintiff attempts to prove that HealthSouth's reason was pretext for discrimination by arguing that the reason was not true -- that she was actually present in HealthSouth's facility at 3:00 p.m., consistent with what she wrote on the time clock addendum. (David Dep. at 77-78.) However, plaintiff's actual guilt or innocence is not the issue if the employer possesses a good faith belief that its work rule was violated. *Damon*, 196 F.3d at 1363 n.3 ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *see also Jordan v. Warehouse Services, Inc.*, 81 F.Supp. 2d 1257, 1270 (M.D. Ala. 2000) ("An employer's good faith, but incorrect, belief that an employee violated a work rule can constitute a non-discriminatory reason for that employee's

42

termination."). Title VII does not require the employer to have good cause for its decisions. *Nix*, 738 F.2d at 1187. "'The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Jones*, 151 F. 3d at 1323 n.16 (11th Cir. 1998) (quoting *Nix*, 738 F. 2d at 1187). "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination." *Nix*, 738 F.2d at 1187 (citations omitted).

Even if plaintiff argues that HealthSouth erred in determining that plaintiff had falsified her time records, this would only show that HealthSouth relied on "erroneous" information. It would not establish that HealthSouth acted in a discriminatory manner. HealthSouth has presented evidence that a black employee, Hudson, initially reported that plaintiff had falsified her time records. (Garner Dep. at 40-41; Smith Aff. at ¶¶ 31-32; *see also* Johnson Aff. at ¶ 8.) Further, HealthSouth received written statements from a racially diverse group of four additional employees indicating that plaintiff was not at work at 3:00 p.m., as she represented on her time sheet. (Boggs Aff. at ¶ 12 and Ex. C attached thereto.) These reports from a total of five employees (three of whom were black) show that HealthSouth had a good faith reason to believe that plaintiff violated its work rule.

Plaintiff also argues that defendant failed to follow its progressive discipline policy by terminating plaintiff even though this was her first instance of falsification. (Pl.'s Br. at 7-8.) This argument is flawed. First, defendants' policies do not require it to follow progressive discipline, and defendants were free to discipline plaintiff up to and including

termination for the offense in question.[25] Second, HealthSouth terminated the only other

employee, of which it is aware, that has misrepresented or falsified time records. (Smith Dep. at

48-49.) In arguing that defendants should have considered a lesser discipline, plaintiff contends:

> Defendants' Standards of Conduct list numerous grounds for dismissal, including,
> but not limited to, incompetence . . . , inefficiency, irregular attendance,
> unauthorized absence, repeated absenteeism or tardiness, neglect of duty,
> disorderly conduct, discourteous treatment of patients, physicians, fellow
> employees or the public, and disregarding established employee procedures or
> standards. . . . [W]hite employees violated each of the aforementioned at least
> once. The progressive discipline policy was followed, with verbal and written
> warnings given. Yet when plaintiff was accused of a violation of the Standards of
> Conduct, she was immediately terminated without being allowed to address the
> situation and with no consideration given to any lesser punishment.

(Pl.'s Br. at 7-8.) However, any evidence that white employees were not terminated for violating

the standards of conduct has no bearing on plaintiff's termination claim because none of these

employees falsified their time records. Thus, plaintiff's argument is reduced to an improper

attempt to second guess the business judgment of HealthSouth. "Title VII does not take away an

employer's right to interpret its rules as it chooses, and to make determinations as it see fit under

those rules." *Nix,* 738 F.2d at 1187. "[A] defendant may terminate an employee for a good or

bad reason without violating federal law," and courts "are not in the business of adjudging

whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Florida,

Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999). Here, there is no evidence that plaintiff's

---

[25] The employee handbook provides:

> The Company has established a disciplinary process for counseling purposes that
> includes counseling sessions, written warnings, probation, and dismissal. Each
> situation is evaluated individually, and the Company will apply the steps most
> appropriate to a given infraction. The Company retains discretion to determine
> the appropriate discipline up to and including discharge.

(David Dep. at Ex. 1 at 19.)

44

termination was based on plaintiff's race in violation of § 1981 and Title VII. Plaintiff has not produced sufficient evidence upon which a reasonable juror could infer that her termination was motivated by consideration of her race.  Defendants are entitled to judgment as a matter of law on plaintiff's termination claim.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that defendants' Motion for Summary Judgment is due to be granted.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 6th day of March, 2001.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

45